TAMPA TRAFFIC ASSOCIATION, a Non-Profit Corporation, Tampa Chamber of Commerce, a Non-Profit Corporation, Hillsborough County Port Authority, a Body Politic and Corporate of the State of Florida, County of Hillsborough of the State of Florida, and City of Tampa, Florida, a Municipal Corporation, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 2384.

United States District Court
S. D. Florida, Tampa Division.

April 21, 1955.

J. Hardin Peterson, Lakeland, Fla., Roy C. Brown, of the firm of Brown, Brown & Corcoran, Tampa, Fla., for plaintiffs.

Herbert Brownell, Jr., Atty. Gen. of the United States, James L. Guilmartin, U. S. Atty., Southern Dist. of Florida, Miami, Fla., Stanley N. Barnes, Asst. Atty. Gen., James E. Kilday and E. Riggs McConnell, Sp. Assts. to the Atty. Gen., for defendants.

Berger & Snetman, Miami, Fla., for the Greater Miami Traffic Ass'n, the Broward County Port Authority, the Dade County Port Authority, and the Fort Pierce Port Authority.

F. C. Hillyer, Jacksonville, Fla., for the South Atlantic Ports Ass'n, the North Carolina State Ports Authority, the City of Wilmington, North Carolina, Bureau of Rates, Industry and Commerce, South Carolina State Ports Authority, Georgia Ports Authority, Savannah Traffic Bureau, City of Jacksonville, Florida, Jacksonville Chamber of Commerce, and the Jacksonville Traffic Bureau.

H. Neil Garson, Atty., and Edward M. Reidy, Chief Counsel, Interstate Commerce Commission, Washington, D. C., Louis A. Schwartz, New Orleans, La., for the New Orleans Traffic and Transportation Bureau, etc.

Arthur J. Dixon, Washington, D. C., for Law Dept., Southern Railway System, intervening defendant railroads.

Erle J. Zoll, Jr., Gen. Commerce Atty., Chicago, Ill., Illinois Central Railroad Co., Y. D. Lott, Jr., Gen. Sol., Mobile, Ala., Gulf, Mobile and Ohio Railroad Co., R. W. Henriott, Commerce Atty., Louisville, Ky., Louisville & Nashville Railroad Co., Osborne, Copp & Markham, Jacksonville, Fla., Division Counsel, Southern Railway Co., Joe L. Lockett, Jr., Houston, Tex., and Fulbright, Crooker, Freeman & Bates, Houston, Tex., for Harris County, Houston, Texas Ship Channel Navigation District.

Before TUTTLE, Circuit Judge, and BARKER and SIMPSON, District Judges.

TUTTLE, Circuit Judge.

This is an action brought by the City of Tampa, Florida, the County of Hillsborough, and local non-profit traffic and port authorities interested in the favorable development of the port of Tampa, seeking a decree of this court setting aside certain reports and orders of the Interstate Commerce Commission, which the plaintiffs contend give "undue or unreasonable preference or advantage" to certain other Gulf and South Atlantic ports in respect of freight rates on export and import traffic, in violation of §§ 1 and 3 of the Interstate Commerce Act, 49 U.S.C.A. §§ 1, 3.[1]

Although plaintiffs sought originally to challenge the jurisdiction of a three judge statutory court in the case by filing with the Court of Appeals for this Circuit their Motion for Leave to File Petition for Writ of Mandamus to require Judge Barker to take jurisdiction of the case sitting as the District Court, that motion was denied, and the jurisdiction of this court is not now challenged.

This case, like the proceedings before the Commission, arises from the competition between all of the important Gulf ports and the South Atlantic ports for the export and import shipping trade that might normally be expected to flow through any of them, depending upon whether freight rates to and from interior points in the United States are sufficiently favorable to make the combination of such rates with the ocean rates truly competitive.[2]

1. "§ 3. Preferences; interchange of traffic; terminal facilities—Undue preferences or prejudices prohibited

"(1) It shall be unlawful for any common carrier subject to the provisions of this chapter to make, give, or cause any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic, in any respect whatsoever; or to subject any particular person, company, firm, corporation, association, locality, port, port district, gateway, transit point, region, district, territory, or any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description." 49 U.S.C.A. § 3.

2. The record discloses that there is a substantial differential to Tampa and all other South Florida ports over Jacksonville and all other Gulf and South Atlantic ports, both as to class and commodity rates. As the example most discussed by the parties, the class rates for the South Florida group exceeded the Jacksonville rates by 35 cents per hundred for Class 1 freight. The differential for other classes were: Class 2, 30 cents; 3, 25 cents; 4, 18 cents; 5, 12 cents; 6, 10 cents. Defendants and the carrier intervenors on the side of defendants contend that the class rates are relatively unimportant, since most of the export-import traffic would normally move at commodity rates. Nevertheless both parties start from the common basis that there does exist a substantial differential in applicable rates.

At the outset it is doubtless appropriate for the court to advert to a fact that is too apparent to require proof in the record: That the population, and the industrial and general economic conditions in the locality in Florida centered upon Hillsborough County and the port of Tampa have so greatly changed during the course of these proceedings as to cause the court to make the comment that what we decide here, on the record before us, may appear to both litigants and to others alike to be unrelated in some important respects to present day conditions. This case originated in 1946 by complaint filed with the Commission. Following an adverse report on August 5, 1948, the hearings were reopened on February 23, 1949, at the request of plaintiffs in order to bring the evidence up to date. This was followed by argument and a further adverse ruling by a division of the Commission, and later by an order of the Commission itself dated July 21, 1952. This suit was filed on August 26, 1953. Obviously, conditions seriously affecting the port of Tampa and its competitive position in relation to the other ports interested in this litigation may have changed substantially during the five years since the evidence was closed. This, it seems to us, argues more strongly for a final disposition of the case on the record as it stands than for action looking towards enlarging the record by causing the case to be returned to the Commission with directions to reopen it for further testimony. After all, what we decide here relates to this record only, and if conditions arising subsequent to the closing of the record require different action, it is open to the aggrieved parties to make their complaint to the Commission in the light of the subsequent events.

■ As we view it, our duty in such a case is that exercised by appellate courts in any case of judicial review of the findings and conclusions of an administrative tribunal, as set out in the Administrative Procedure Act of 1946.[3] The scope of review under the Administrative Procedure Act has been commented on by the much-quoted decision of the Supreme Court in Universal Camera Corp. v. N. L. R. B., 340 U.S. 474,[4] 71 S.Ct. 456, 95 L.Ed. 456. The scope of such review has been well stated by Judge Christenberry of this Circuit in Louisiana Public Service Commission v. United States of America and the Interstate Commerce Commission, D. C., 125 F.Supp. 180, at page 182, where it is said:

"* * * We take it to be settled law that an order of the Commission is entitled to finality, and may not be set aside, modified or disturbed on judicial review, if such order of the Commission lies within the scope of the Interstate Commerce Statute, and is based upon adequate findings that are supported by substantial evidence."

Plaintiffs call our attention to the fact that the examiner for the Commission who heard the major part of the original

---

3. See 5 U.S.C.A. § 1001 et seq. Section 10(e) provides as follows: "* * * the reviewing court shall * * * hold unlawful and set aside agency action, findings, and conclusions found to be * * * unsupported by substantial evidence. * * * In making the foregoing determinations the court shall review the whole record * * *."

4. 340 U.S. at page 488, 71 S.Ct. at page 464, the Court says: "* * * The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement in both statutes that courts consider the whole record. * * *

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. * * *"

testimony is not the examiner who heard the later testimony and who wrote the examiner's report. They argue from that fact that this, in some degree, changes the standard of weight to be given to the adjudications of the Commission. They say only, however, that this "requires this court to scrutinize the evidence closely." This we have done.

Plaintiffs herein fall within the class of parties for whose benefit Section 3(1) of the Interstate Commerce Act was adopted. If they established to the satisfaction of the Commission that the carriers involved had subjected any of them to any *undue or unreasonable* prejudice *or disadvantage*" (emphasis supplied) then it was the duty of the Commission to take appropriate action to put an end to such evil. Moreover, if they established that the carriers had subjected them to such undue or unreasonable prejudice or disadvantage by such clear and convincing proof that the record, viewed as a whole, would not support a contrary finding or conclusion by the Commission, then, under the principles stated above, it would be our duty to set aside such contrary order of the Commission and return the case to the Commission with directions to take such steps as would eliminate the evil.

Here the evil complained of involves the several complicated and intricate functions of rate-making, concerning which the Supreme Court has said:

"The structure of a rate schedule calls in peculiar measure for the use of that enlightened judgment which the [Interstate Commerce] commission by training and experience is qualified to form. [State of] Florida v. United States, 292 U.S. 1, 54 S.Ct. 603, 78 L.Ed. [1077]". Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S. Ct. 692, 694, 695, 78 L.Ed. 1260.

It also involves the subject of "grouping" of ports and localities, another subject which lends itself to consideration primarily by a body trained and experienced in the art. On this subject the Supreme Court said in State of New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 1230, 91 L.Ed. 1492:

" * * * The choice of groupings is plainly a specialized problem in transportation economics upon which the Commission is peculiarly competent to pass. Its judgment that the differences in consists between the territories do not justify the present differences in interterritorial class rates is, indeed, an expert judgment entitled to great weight. We could not disturb its findings on the facts of this record without invading the province reserved for the expert administrative body."

But, so say the plaintiffs, when all the presumptions of correctness are given to the action of the Commission and when we have paid due attention to the principle, that many of our complex problems can best be solved by giving especial deference to the expertise with which its members are endowed, nevertheless there was such a departure from the facts or such erroneous application of legal principles to the facts as to require us to overrule the action of the Commission in this instance.

We cannot agree. We are unable to find from a consideration of the record as a whole that the orders complained of are clearly erroneous.

Although we cannot summarize all of the pertinent facts, nor even all of those which are of substantial importance, an understanding of our conclusion requires that we state briefly the principal points urged upon us by the parties.

Essentially the case made by Tampa is that it has a well developed and well equipped port capable of handling deep sea shipping; that substantial war time shipping had contributed to the building up of the port, because expense was then no factor; that Tampa has a large volume of locally generated overseas cargo which is picked up as a bulk cargo, but

which leaves facilities on most ships for top cargo which is not available at Tampa because of the unfavorable freight rates in question, thus requiring ships to go to other ports to complete their loading to capacity; that Tampa is in direct and active competition with, and should be grouped with, the other Gulf ports, and it is not in substantial competition with, and should not be grouped with, the South Florida ports of Port Everglades, Palm Beach, Miami and Fort Pierce; the differential over Jacksonville, and all other ports on the Gulf and South Atlantic north of Jacksonville ranges, in the case of export and import class rates, from 35 cents per hundred pounds for Class 1 to 10 cents for Class 6, and that differentials in commodity rates correspond; that these differentials are based solely on distance, whereas distance should not be a controlling factor in grouping ports; but if it is controlling then Tampa, because of its favorable location in relation to the South Florida ports, should be saved, by this distance factor, from the fate of being grouped with the more distant Florida ports; that the exclusion of Tampa as a Gulf port by the Commission is inconsistent with the prior action of the Commission grouping Corpus Christi, Texas, with the Gulf ports, since Corpus Christi was farther in point of distance from some of the shipping points than Tampa.

The Commission and the intervening railroads counter by saying that there is a historical basis, albeit not of very long duration, for the differential adjustment between the South Florida ports group and points in interior territory over Jacksonville and for the inclusion of Tampa in the South Florida group; that unquestionably additional transportation service must be provided on traffic to the South Florida ports and to Tampa individually, and that moreover transportation conditions in the Florida peninsula were less favorable than in the South generally; that elimination of the differential would result in an unnecessary sacrifice of railroad revenues; that there was insufficient evidence of competition between the port of Tampa and the South Florida ports on the one hand, and either the Gulf ports group or the South Atlantic group on the other.

While we recognize that the extension to or withholding from, a particular port of a particular rate structure on import and export traffic may have the effect of greatly aiding or disastrously hindering in the development of a port, there are many circumstances that enter into the determination as to whether such rate structure shall or shall not be applied that are the subject of legitimate and proper concern of the rate making body. That is to say that not every differential, even though damage can be clearly shown to follow, amounts to "undue or unreasonable prejudice or disadvantage."

The port of Tampa has many fine advantages, in its desire to compete in foreign trade, as disclosed by the record. It has a great bulk of locally generated freight for foreign shipment; it has a large and rapidly growing local demand for the products of foreign import; it has a natural and geographical affinity with certain Caribbean ports which contributes to its availability and value in the shipment of cargoes in small ships as well as in ocean-going vessels. On the other hand, Tampa suffers from one disadvantage in common with other Florida port cities that are south of the Jacksonville-Chattahoochee line; it is more distant, by approximately 200 miles, from all the shipping points that ship through Jacksonville, and by some 150 miles or more if shipment travels to the west of Jacksonville. These distances, of course, are substantially increased if Tampa is grouped with the South Florida ports and the distances are averaged.

This factor of greater distance, when taken into consideration with all other circumstances disclosed by the record, many of which are not really in dispute, places upon the Commission the duty of determining whether the grouping of Tampa with the other South Florida ports was an acceptable element in deter-

mining the differentials to be applied over Jacksonville,[5] and, if so, whether the differentials, applied to the group thus recognized, amounted to an undue or unreasonable preference or advantage to any of the ports involved, or subjected Tampa and its port to undue or unreasonable prejudice or disadvantage. The Commission, applying its experience and known principles of rate-making to the facts, found against Tampa's contention in both respects.

We do not consider that it would be beneficial to recite the pros and cons of the evidence.[6] We find that, both as to the propriety of grouping Tampa with the South Florida ports, and as to the reasonableness of the differential when applied to such a group, based on the record before us, the findings and conclusions of the Interstate Commerce Commission are based on credible and substantial evidence, and are within the scope of the applicable statutes. They must, therefore, be sustained.

The complaint will, therefore, be dismissed at plaintiffs' cost.

BARKER, District Judge (dissenting).

I cannot agree that the grouping of the Port of Tampa by the Interstate Commerce Commission with the South Florida ports and that the rate differentials applied to Tampa over Jacksonville and all other ports of the Gulf and South Atlantic grouping, are based on credible and substantial evidence and are within the scope of the applicable statutes; on the contrary it is my opinion that the action of the Commission is clearly erroneous and amounts to an arbitrary and unreasonable preference and advantage to the other ports involved, and subjects

the Port of Tampa to undue and unreasonable prejudice and disadvantage in violation of Section 3(1) of the Interstate Commerce Act; I, therefore, respectfully dissent.

---

5. As to the Commission's function in the grouping of ports, see Ayshire Collieries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243; State of New York v. United States, 331 U.S. 284, 326, 67 S.Ct. 1207, 91 L.Ed. 1492.

6. For a further discussion of the evidence, findings and conclusions, which we need only find support the final order on the record as a whole, see 272 I.C.C. 277, 281 I.C.C. 483, 286 I.C.C. 455.